FILED

2007 Feb-08  PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CHRIS EVANS and IVAN ALLEN,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-05-S-405-NE** |
| | ) | |
| **CITY OF HUNTSVILLE, A MUNICIPAL CORPORATION, d/b/a VON BRAUN CENTER,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chris Evans and Ivan Allen brought suit against defendant, the City of Huntsville, a Municipal Corporation d/b/a Von Braun Center ("VBC"), alleging a hostile work environment and unequal pay on the basis of race, retaliation, and negligent supervision, training, and retention. This matter is before the court on defendant's motion for summary judgment (doc. no. 31) and motion to strike (doc. no. 39). Defendant seeks dismissal of all claims.

### PART ONE

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

**PART TWO**

*Summary of Relevant Facts*

VBC is a multi-purpose entertainment venue featuring an Arena, a Concert Hall, and a Playhouse Theater to accommodate concerts, Broadway performances,

ballets, symphonies, and a full range of sporting events.[1]  Ron Evans is Executive Director of VBC, Steve Maples is Chief Operating Officer, and Michael Vojticek is Assistant Director.[2]  VBC has approximately sixteen different departments, one of which is the Arena Operations Department (hereinafter "Operations Department").[3]

On average, VBC employs approximately fifty-one part-time or on-call employees to assist in setting up events, maintaining the facility, and cleaning up after events.[4]  The part-time employees assigned to work in the Operations Department are classified as crewmen.[5]  Within the Operations Department, crewmen are assigned to work in one of three areas: Arena Operations, North Exhibit Hall, or South Exhibit Hall.[6]  Throughout their employment at VBC, Plaintiffs have worked in the Operations Department, assigned to Arena Operations.[7]

Jimmy Clark is the Director of Arena Operations.[8]  Within Operations, three African-American supervisors, Junior Cross, Ray Cross or Lurinzo Sullivan, supervise the employees.[9]  Junior Cross supervises the Arena Operations employees

---

[1] *See* doc. no. 32 at 3.

[2] *See id.*

[3] *See id.*

[4] *See id.* at 4.

[5] *See id.*

[6] *See id.*

[7] *See id.*

[8] *See id.*

[9] *See id.* at 4-5.

who work Event Set-Up, entailing building stages, setting up chairs, laying down turf and making ice.[10]  Ray Cross supervises the Arena Operations employees in Event Support, which encompasses working during events at VBC by sweeping the concourse and monitoring the level of supplies in the restrooms.[11]  Lurinzo Sullivan supervises the Arena Operations employees in Clean-Up, which includes picking up after an event and mopping floors.[12]

Plaintiff Chris Evans was hired by VBC in September 2000 at a rate of $6.00 per hour and assigned to clean up the arena and assist in setting up stages.[13]  Evans earned a pay raise of $7.00 per hour in April 2001.[14]  Evans received another raise in November 2005 and was paid $8.00 per hour.[15]

Plaintiff Ivan Allen was hired by VBC to work in Arena Operations on June 11, 2001, and was paid a starting rate of $7.00 per hour.[16]  Allen received a raise in November 2005 and was paid $8.00 per hour.[17]

Evans and Allen attribute the following racially derogatory comment to Clark,

---

[10] *See* doc. no. 32 at 5.

[11] *See id.*

[12] *See id.*

[13] *See id.* at 6.

[14] *See id.*

[15] *See id.*

[16] *See id.*

[17] *See id.* at 7.

who told the crew: "You people are the most negative people I ever worked with."[18]
Evans explained that the comment was directed to the African American employees
in the room and was made in the presence of Clark's Caucasian supervisor at the time,
Johnny Hunkapillar.[19]  Clark was informed by a crewman Bobby Ashby that "you
people" was offensive, and Clark immediately apologized to Ashby and the other
crew members.[20]  Junior Cross, Ray Cross, and Sullivan informed Vojticek and
Maples about the comment.[21]  Vojticek and Maples addressed the issue with Clark,
and Clark has not used the term "you people" since this incident.[22]

Evans also complains about an incident in June or July of 2005, when after
discussing a scheduling issue with Clark's supervisor, Ron Grimes, Clark stormed
toward Evans and started yelling and threatening him.[23]  Evans contends that Clark
stood over him in a physically intimidating and demeaning manner as he yelled about
Evans' attempt to talk to Clark's supervisor without Clark being present.[24]  Clark also
yelled at Evans in July 2005, after Evans returned to work from an on-the-job injury,
threatening that Evans would be fired.[25]

---

[18] *See* doc. no. 32 at 7.

[19] *See* doc. no. 32, Exh. C at 68-72 (Evans Depo.).

[20] *See* doc. no. 32 at 7-8.

[21] *See id.* at 8.

[22] *See id.*

[23] *See* doc. no. 38 at 21.

[24] *See id.*

[25] *See id.* at 22.

At one point, Tony Ayers, a Causian male, served as an arena operations manager.[26]  Ayers was later transferred to another area at VBC.[27]  Evans worked with Ayers for approximately nine months, but Ayers did not supervise Evans.[28]  On two separate occasions, Evans heard Ayers make the statement, "Every time a group of black men get together it's a gang."[29]  The second time Evans heard Ayers make the comment, he reported it to Sullivan.[30]

In the Spring or Summer of 2004 VBC limited all part-time employees (African American and Caucasian) to working 32 hours per work week.[31]  Vojticek recommended the reduction because allowing part-time employees to work full-time hours would result in the need to extend full-time benefits to all employees.[32]

VBC laid off almost all of the part-time Arena Operations crewmen in August or September of 2004.[33]  Maples directed the lay-off of most part-time employees because no events were scheduled for September and full-time staff would be able to cover the work with the assistance of a few part-time employees.[34]  A few hours after

---

[26] *See* doc. no. 32, Exh. C at 85 (Evans Depo.).

[27] *See id*. at 100.

[28] *See id*. at 124, 128

[29] Doc. no. 32 at 8.

[30] *See id*.

[31] *See id*. at 9.

[32] *See* doc. no. 32 at 9.

[33] *See id*.

[34] *See id*. at 10.

announcing the lay-off, Clark returned to tell Allen, along with Bobby Ashby, Roy Flint, and Mike Harris—all African American crewmen— that they would be able to work in the South Hall during the lay-off.[35]  Evans understood the lay-off to be temporary, and wanted to return to work at the VBC.[36]

Allen and Evans also complain that they were discriminated against on the basis of race with regard to pay since two white employees, Robert Simmons and Frances Glassco, were paid more.[37]  Simmons was hired by VBC in 2001 at a starting pay rate of $6.00 per hour.[38]  Defendant claims that Simmons received a raise to $7.25 per hour in April 2003, because he showed great initiative and a strong work ethic, and because he performed tasks more difficult than those performed by other part-time crewmen.[39]  Glassco was hired by VBC on January 26, 2004.[40]  Clark recommended her starting wage to be $7.50 per hour based on his prior experience supervising her at another job and because of her training and experience in detailed cleaning.[41]  Glassco received $7.50 per hour until her employment with VBC ended

---

[35] *See* doc. no. 32 at 10.

[36] *See id.*

[37] *See id.*

[38] *See id.*

[39] *See* doc. no. 32 at 11.

[40] *See id.*

[41] *See id.* at 12.  Plaintiffs vehemently contest that "detail" cleaning required special qualifications and maintain that African American employees did not receive the higher pay for performing the same work as Glassco.  *See* doc. no. 38 at 6.

on March 4, 2005.[42]  From April 2003 through November 2005, Evans and Allen were paid $7 per hour ($0.25 less per hour than Simmons from Janaury 26, 2004 until March 4, 2005, and $0.50 less per hour than Glassco).[43]  Plaintiffs' hourly wage was increased to $8.00 in November 2005.[44]  Since approximately 2002, Evans performed primarily cleaning duties in Arena Operations.[45]

Plaintiffs brought suit alleging claims of race discrimination, unequal pay, and harassment arising from their employment as part-time crewmen persons in VBC's Operations Department.  Plaintiffs also allege claims of negligent supervision, training, and retention of Jimmy Clark.  Additionally, Evans asserts a claim for retaliation.[46]

## PART THREE

### *Discussion of Plaintiffs' Claims*

A.  <u>Hostile Work Environment on the Basis of Race</u>

To succeed on a hostile work environment claim, each plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome  harassment;

---

[42] *See* doc. no. 32 at 12.

[43] *See* doc. no. 32 at 12.

[44] *See id.*

[45] *See id.* at 13.

[46] The Amended Complaint indicates that only Evans asserts a retaliation claim.  *See* doc. no.3 at 6.  Nonetheless, defendant moves for summary judgment on the retaliation claims for both plaintiffs, and plaintiffs appear to respond to the motion.  Thus, the court will analyze both plaintiffs' retaliation claim.

(3) the harassment was based upon race; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of his employment; and (5) there is a basis for holding his employer responsible under a theory of either vicarious or direct liability. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective and a subjective component. To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of offensive conduct, courts examine the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Johnson,* 234 F.3d at 509 (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995). It is not necessary to prove each of the factors individually. Nevertheless, the factors, taken together, must reveal conduct that is so

9

extreme that it caused a material change in the terms and conditions of a plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher*, 524 U.S. at 788 (citations omitted).

Defendant argues that it is entitled to summary judgment on plaintiffs' hostile work environment claims because neither plaintiff can show that any alleged harassment was severe or pervasive.  The only racially derogatory comment to which Allen was subjected during his employment at the VBC was Clark's statement to the crew: "You people are the most negative people I ever worked with."[47]  This isolated comment is insufficient as a matter of law to support Allen's hostile work environment claim.  More importantly, once the statement was brought to a manager's attention, it was addressed immediately.  Thus, summary judgment on Allen's hostile work environment claim is due to be granted.

Evans points to additional evidence to support his hostile work environment claim.  In addition to the "you people" remark, Evans complains about an incident in the summer of 2005 when Clark yelled at him and threatened him after Evans attempted to talk to Clark's supervisor about a scheduling issue and another incident in July 2005 when Clark yelled at Evans following his on-the-job injury.  While such conduct may be inappropriate or abusive, there is no evidence to support the

---

[47] *See* doc. no. 32 at 7.

contention that such abuse occurred on the basis of race.  While Evans attempts to couch his feelings about the abuse in racial terms, explaining that he felt like a slave, there is no evidence to support that plaintiffs' race motivated these incidents.  It may be equally likely that Clark was just an abusive supervisor.  Without some evidence to point toward racial animus, the hostile work environment claim must fail.[48]

Plaintiffs failed to satisfy both the subjective and objective components of this inquiry.  Plaintiffs failed to produce any evidence showing how the isolated remarks interfered with their work performance.  Upon review of the parties' submissions, the court agrees with defendant that it is entitled to summary judgment on this claim against both plaintiffs.

B.    Unequal Pay on the Basis of Race

Plaintiffs claim that they were discriminated against on the basis of race with regard to pay since Robert Simmons, a white male crewman, was paid $7.25 per hour, and Frances Glassco, a white female was paid $7.50 per hour,  while plaintiffs were paid $7.00 per hour.  Disparate pay claims under Title VII are governed by the familiar burden-shifting framework set out by the Supreme Court in *McDonnell*

---

[48] Evans also refers to comments made by a manager over another area, Tony Ayers, who had no supervisory authority over Evans.  While the comments were offensive, plaintiff does no more than refer to them, without making any argument or citing to supporting evidence to indicate how statements made by a non-supervisory employee were sufficiently severe or pervasive to alter the terms and conditions of his employment.  Plaintiff further fails to explain or counter defendant's argument that it cannot be held vicariously liable for Ayers' remarks.  As such, Evans fails to meet his burden on summary judgment.

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992).

Thus, plaintiffs bear the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 & n.6 (1981).  "The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255.  If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S. at 257, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity."  *Id.* at 255 & n.10.  The burden then shifts to the plaintiffs to "come forward with evidence, including the previously produced evidence

establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

To establish a *prima facie* case of racial discrimination, each plaintiff must show that he is a member of a protected class and that the job he performed was similar to higher paying jobs performed by those outside the protected class. *See, e.g., Miranda*, 975 F.2d at 1529.

Defendant first argues that Simmons is not a similarly situated comparator because he performed duties on ice that plaintiffs refused to perform.[49]  Defendant

---

[49] Plaintiffs dispute that others would not work on the ice and point to testimony from supervisors indicating that other employees including plaintiffs performed ice-related tasks. *See* doc. no. 38 at 18.

maintains that to be "similarly situated," one must be "nearly identical" in all respects, and that merely having the same title of "crewman" is not enough.  Defendant cites *Mannicia v. Brown,* 171 F.3d 1368 (11th Cir. 1999), in support.  The court agrees that "when a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated," the Eleventh Circuit evaluates whether "the quantity and quality of the comparator's misconduct [is] nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006).  But in considering discrimination cases where disparate pay is alleged, the Eleventh Circuit also has distinguished between the more strict standard under the Equal Pay Act, requiring a plaintiff to prove "that she performed substantially similar work for less pay," and the "relaxed standard of similarity between jobs" in Title VII cases.  *Miranda*, 975 F.2d at 1526.  *See also EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1570 (11th Cir. 1993) (discussing the distinction between disparate pay claims under Title VII and the Equal Pay Act).

Upon review of the evidence submitted by the parties, the court concludes that Simmons is a proper comparator and is similarly situated to plaintiffs for purposes of Title VII.  Sufficient evidence has been submitted by the parties to show that those filling the position of "crewman" performed similar duties and received relatively

similar pay for performing those duties.  In attempting to explain the difference in pay between plaintiffs and Simmons, defendant points to purported individual characteristics possessed by Simmons which led to his raise in pay (see discussion of pretext below)— not to any special designation in status or job description of the type of "crewman" position occupied by Simmons versus that performed by plaintiffs. Therefore, defendant cannot prevail on its challenge to the establishment of a *prima facie* case, and is not entitled to summary judgment on this basis.

Defendant next argues that there is insufficient evidence that the difference in pay between Simmons and plaintiffs was based on race.  Defendants explain as their non-discriminatory reason for the pay differential that Clark and Pugh recommended that Simmons be paid $7.25 per hour because he showed great initiative, a strong work ethic, and performed tasks more difficult than those performed by other part-time crewmen.[50]  Plaintiffs counter with testimony from supervisors Ray Cross and Junior Cross that Simmons did not volunteer or take initiative more than other employees, including plaintiffs.[51]  Also, plaintiffs submitted evidence of comments made by Clark that displayed racial animus.  Even if the comments were insufficiently severe or pervasive to support a hostile work environment claim, these comments are

---

[50] *See* doc. no. 32 at 13.

[51] *See* doc. no. 38 at 17-18.

15

relevant to show intent or discriminatory animus on the part of defendant.[52]

Finally, defendant argues that it can point to two African-American part-time crewmen, Edward Morris and Carl Evans, who were paid $8.00 and $7.30 respectively, in order to show that plaintiffs' lower pay was not racially motivated.[53] The Eleventh Circuit has noted that such evidence is not dispositive, but instead could support the conclusion that defendant "acted too slowly in rectifying the admittedly inequitable salary paid to the plaintiff[s]." *Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1506 (11th Cir. 1988).

At minimum, a fact dispute exists on the issue of pretext, and therefore summary judgment is inappropriate on the Title VII disparate pay claim based on race.[54] Accordingly, the motion is due to be denied in this respect.

---

[52] There is much disputed testimony concerning Frances Glassco and the justification for hiring her at a higher level of pay than most crewmen. Defendant maintains that Glassco had experience in detailed cleaning and that she was hired for this specific and more difficult task. This evidence is undermined by the fact that there is no specific position for a "detailed cleaner" and that prior to and after Glassco's employment, no one received elevated pay for detailed cleaning. Plaintiffs also offer testimony of the same type of work being performed by African American employees at a lower rate of pay. The conflicting evidence creates a fact dispute that cannot be resolved on summary judgment.

[53] *See* doc. no. 32 at 25.

[54] The court notes that plaintiffs attempted to assert a disparate pay claim on the basis of race under both Title VII and the Equal Pay Act. *See* doc. no. 1 at 5-7 (Complaint). Of course, the Equal Pay Act only prohibits wage discrimination on the basis of gender. *See* 29 U.S.C. § 206(d)(1). Defendant, however, did not move for summary judgment on the Equal Pay Act claims. Thus, the court will not address the issue at this juncture. This does not preclude defendant from making a motion for judgment as a matter of law under Rule 50 at trial.

C.    Retaliation

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).

The filing of a formal charge of discrimination with the EEOC clearly is protected under the "participation clause." *See, e.g., Berman v. Orkin Exterminating*

17

*Co.*, 160 F.3d 697, 702 (11th Cir. 1998).  That clause protects actions and statements which "occur in conjunction with or after the filing of a formal charge with the EEOC."  *Total System Services, Inc.*, 221 F.3d at 1174 (citation and footnote omitted).

Generally speaking, a plaintiff must prove three elements to establish a *prima facie* case of retaliation:  (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001) (Title VII); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (Title VII); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (FMLA); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (Title VII); *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (Title VII); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998) (Title VII); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997) (Title VII); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (Title VII); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (Title VII and § 1981).

"[A] close temporal proximity between two events *may* support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (emphasis supplied) (citing *Brungart v. BellSouth Telecommunications, Inc*., 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is* sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection") (emphasis supplied)); *see also, e.g*., *Bass,* 256 F.3d at 1119 ("Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were not wholly unrelated.") (emphasis supplied) (citing *Gupta*, 212 F.3d at 590 ("For purposes of a prima facie case, 'close temporal proximity' *may be* sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'") (emphasis supplied) (in turn quoting *Farley*, 197 F.3d at1337)).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three-month and four-month gaps, respectively, between an

employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[55]

Even prior to the Supreme Court's decision in *Breeden*, the Eleventh Circuit had required that the interval between events be brief.  In *Bass*, for example, the plaintiff began to suffer adverse employment actions within a matter of days after filing an EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass was assigned to clean out a warehouse — work ordinarily done by inmates supplied by the Department of Corrections.  Between December 1995 and April 1996, Bass had no routine work assignment, performed custodial and clerical duties, and usually was supervised by personnel who were less senior than he.  Middleton, who was in charge of the Training Instructors, and Chief Smith ordered Bass not to record on his work logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101.  The Eleventh Circuit found that "[t]he close temporal proximity between filing of the EEOC complaint and the adverse actions is sufficient

---

[55] In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam).

in this case to satisfy the third prong of the prima facie case of retaliation." *Bass*, 256 F.3d at 1119.  In *Donnellion v. Fruehauf Corp.*, the Eleventh Circuit held that a temporal gap of only one month between the plaintiff's act of filing an EEOC charge alleging that her employer denied her a sales representative position because of her sex and subsequent termination of the plaintiff's employment was sufficiently close to establish a causal nexus.  794 F.2d 598 (11th Cir. 1996)

On the other extreme, temporal gaps of fifteen to twenty months are outside the pale of reasonableness.  *See, e.g., Breeden*, 532 U.S. at 273-74 (holding that twenty month gap "suggests, by itself, no causality at all"); *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) (holding that gaps of fifteen and twenty-one months between the employee's and employer's respective actions were too great to support a causal nexus); *see also*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 n.4 (11th Cir. 2001) (opining that a two year break between the plaintiff's grievance and the employer's adverse action "probably would prevent a court from finding a causal nexus").

> Assuming, as the district court did, that the transfer to the jail was an adverse employment action, Appellant's transfer and termination occurred 15 and 21 months, respectively, after Appellant filed her grievance against her supervisor.  Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to Appellant's protected activity.  The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the

former caused the latter.  *See, e.g.*, *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (13-month delay between protected activity and termination too long for causation to be established); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation); *cf. Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (averring that fact plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation").

*Maniccia*, 171 F.3d at 1369-70 (footnote omitted).

The *Maniccia* court's approving citation of the Tenth Circuit's opinion in *Conner v. Schnuck Markets,* 121 F.3d 1390, 1395 (10th Cir. 1997), when read in conjunction with the other decisions relied upon, appears to indicate that the expiration of four months or more between a plaintiff's engagement in protected activity and a subsequent adverse employment action nullifies any inference of causation premised solely on the temporal sequence of events.  That conclusion is buttressed by the Eleventh Circuit's opinion in *Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001), holding that a three and one-half month interval between a plaintiff's notice to her employers of her need for extended leave, because of her son's terminal illness, and her subsequent termination did *not*,

> standing alone, show that the City's articulated reasons for her termination were pretextual, *see e.g.*, *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month time lag

> between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was, standing alone, insufficient to establish a causal connection).

*Wascura*, 257 F.3d at 1245; *see also id.* at 1248 ("In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation."). *Cf. Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding, in the context of a retaliation claim founded on Florida's Whistleblower Act, that a temporal gap of seven months between the plaintiff's protected conduct and subsequent termination was too great to establish that the two events were casually related, especially when the record was replete with reasons for the termination unrelated to plaintiff's protected conduct).

Other circuits also have concluded that the temporal proximity between protected activity and a following adverse employment action must be "very close" when it is the primary basis for concluding that a causal nexus exists. *See O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) ("Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171 , 1179 (10th Cir. 1999) (holding that three month period, standing alone, is insufficient to establish causation); *Hughes v.*

23

*Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (finding four month period of time between plaintiff's protected activity and the receipt of disciplinary letters was insufficient to establish a causal connection). *See also Stavridis v. Energy Absorption Systems, Inc.*, No. 98-6828 (11th Cir. Nov. 16, 1999) (unpublished opinion, at 6) (a case in which the plaintiff was terminated eleven months after filing his first EEOC charge, and five months after filing his second EEOC charge, and the Eleventh Circuit held that "any slight inference of retaliation that may arise as a result of . . . temporal proximity is outweighed by the overwhelming evidence of [plaintiff's poor job performance] . . . .").

Defendant concedes that Evans and Allen engaged in protected activity when they each filed EEOC charges in November 2003.[56]  Defendant further concedes that Evans and Allen suffered adverse employment actions in the Spring 2004 when their hours were reduced to 32 hours and that Evans suffered an adverse employment action in late Summer/early Fall 2004 when he was laid off for three weeks.[57]  Defendant argues that plaintiffs cannot prevail on their retaliation claim because the lay-off and hour reduction did not occur until more than eight months after plaintiffs

---

[56] *See* doc. no. 32 at 20.  Defendant moves for summary judgment on the retaliation claim as if both Evans and Allen are asserting such claims.  Instead, the amended complaint reveals only Evans is asserting a retaliation claim (perhaps because Allen was not subject to the lay-off that most part-time employees experienced).  Nonetheless, the summary judgment brief, response, and reply are written as if both plaintiffs are attempting to assert a retaliation claim.

[57] *See id.*

filed their EEOC charges.[58]

Defendant further argues that it presented a legitimate non-discriminatory reason for the lay-off and hour reduction: part-time employees' hours were reduced to prevent having to pay full-time benefits, and the lay-off was due to lack of work. The hour reduction and lay-off applied to part-time employees regardless of race — both African American and Caucasians were affected.  Plaintiffs' response to this argument is merely one conclusory sentence that utterly fails to address the arguments presented by defendant and points to no evidence in the record in support.[59]  This does not satisfy plaintiffs' burden in responding to a motion for summary judgment that is supported by relevant legal authority and evidence.  The court agrees with defendant that it has presented a legitimate, non-discriminatory reason for the hours reduction and lay-off, and that plaintiff has failed to meet its burden to show that this reason was a pretext for retaliation.  Accordingly, defendant's motion for summary judgment on plaintiffs' retaliation claim (assuming both plaintiffs attempted to advance such a claim) is due to be granted.

---

[58] *See* doc. no. 32 at 20-21.  The "eight months" representation is not precise.  Plaintiffs filed charges of discrimination with the EEOC in November 2003.  Part-time employees were limited to working 32 hours per week in the Spring of 2004.  The lay-off occurred in late Summer/early Fall of 2004.

[59] *See* doc. no. 38 at 35.  Plaintiffs' entire argument amounts to the following sentence: "Here there are numerous examples of retaliation against plaintiffs and others who filed EEOC charges, including denial of 'crew leader' position and pay, reduction of hours, and further hostile acts."  *Id*.

D.     Negligent Training, Supervision, and Retention

Plaintiffs' negligent training, supervision, and retention claim is directly linked to plaintiff's claims of discrimination and harassment.[60]   In response to defendant's motion for summary judgment, plaintiff must come forward with a legal argument and evidence to show defendant is not entitled to judgment as a matter of law.   In response to defendant's motion for summary judgment, plaintiffs only argue that defendant "knew, or should have known, of the unworthiness of Clark both at his hiring, and when he harassed the plaintiffs in front of his supervisors."[61]   Without citation to any evidence to support this claim, it is difficult to discern what facts support plaintiffs' negligent training, supervision, and retention claim.   In other portions of their responsive brief plaintiffs refer to Clark's previous employment with the City of Huntsville, wherein Clark was suspended and ultimately resigned prior to being employed by VBC.[62]   What plaintiffs fail to do is explain how the issues that led to Clark's suspension and resignation from his employment with the City of

---

[60] *See* doc. no. 1 at 8-9 (Complaint).  It is important to note that this claim does <u>not</u> include a claim for negligent hiring.  *See* doc. no. 44 at 1 ( ". . . plaintiffs have not attempted to add a claim of negligent hiring.").

[61] Doc. no. 38 at 36.

[62] When Clark worked for the City of Huntsville, he purchased a mirror for a remodeling job for a private client, and submitted the invoice to the City of Huntsville for payment.  *See* doc. no. 38 at 11.  Clark personally paid the invoice before the City of Huntsville had notice, but he was suspended as a result, and ultimately he resigned.  *See id.  See also* doc. no. 41 at 3 (Defendant's Reply).  Clark did not reveal these facts when he applied for and was hired to work for VBC the same month he resigned from the City of Huntsville.  *See* doc. no. 38 at 12-13.

Huntsville, had defendant known about them, could support plaintiffs' claims that defendant's negligence caused Clark's alleged harassment.  Further, because plaintiffs' response to defendant's summary judgment motion focuses upon the alleged harassment as the tortious conduct forming the basis of their charge of negligent training, supervision and retention, the claim must also fail in that the court has found that plaintiffs' hostile work environment claims fail as a matter of law. Finally, the summary judgment evidence indicates that when defendant became aware of any conduct that could be considered as illegal harassment, it took appropriate remedial action.[63]  In order to succeed, plaintiffs must show that VBC was aware of purported tortious conduct and failed to take adequate remedial steps to correct the situation.  *See Potts v. BE&K Construction Company*, 604 So. 2d 398, 400 (Ala. 1992).  Plaintiffs fail to meet their burden on this issue, and thus, summary judgment is due to be granted.

### PART FOUR

*Motion to Strike*

Defendant moves to strike portions of plaintiffs' brief in opposition to summary judgment and portions of Exhibits 25, 26, and 27 of plaintiffs' evidentiary submission in opposition to summary judgment.[64]  Defendant complains that plaintiffs are

---

[63] *See* doc. no. 32 at 7-8.

[64] *See* doc. no. 39.

attempting to add a claim for negligent hiring that is not present in their complaint, by presenting arguments to support a negligent hiring claim in their response to defendant's motion for summary judgment.   While plaintiffs do appear to make numerous references to the negligent hiring of Clark, plaintiffs have conceded that they are not attempting to add a belated claim for negligent hiring.[65]

Defendant also contends that portions of plaintiffs' evidentiary submissions contain inaccurate information or amount to hearsay.  Because the court did not have to rely on the challenged exhibits in denying defendant's motion for summary judgment on the disparate pay claims, the motion to strike should be denied as moot. The court makes no ruling as to whether these exhibits would be admissible at trial either in their present form or in a corrected form.

## PART FIVE

### *Conclusions and Orders*

For the foregoing reasons, defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  Defendant's motion for summary judgment is granted with respect to plaintiffs' claims for hostile work environment, retaliation, and negligent training, supervision, and retention.  Defendant's motion for summary judgment on the disparate pay claims is denied.   Plaintiffs' claims for

---

[65] *See* doc. no. 44 at 1.

hostile work environment, retaliation, and negligent training, supervision, and retention are dismissed with prejudice.  Plaintiffs' claims alleging disparate pay remain.

Defendant's motion to strike is DENIED AS MOOT.

DONE this 8th day of February, 2007.

_____
United States District Judge